UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Mary Gardner Beauregard,

      Plaintiff,

      v.                                   Civil Action No. 5:13-cv-206

Commissioner of Social Security,

      Defendant.

## REPORT AND RECOMMENDATION
(Docs. 17, 22)

Plaintiff Mary Gardner Beauregard brings this action pursuant to 42 U.S.C. § 405(g) of the Social Security Act, requesting review and remand of the decision of the Commissioner of Social Security ("Commissioner") denying her application for disability insurance benefits. Pending before the Court are Beauregard's motion to reverse the Commissioner's decision (Doc. 17), and the Commissioner's motion to affirm the same (Doc. 22). For the reasons stated below, I recommend that Beauregard's motion be GRANTED in part, the Commissioner's motion be DENIED, and the matter be REMANDED for further proceedings and a new decision.

## Background

Beauregard was 48 years old on her amended alleged disability onset date of January 7, 2008. She has a high school education and work experience as a housecleaner. She lives with her husband. She has not worked full time since 2000 (AR 80), and in

October 2008 she decreased her weekly work hours from at least 12 to six because of pain (AR 290).

Beauregard suffers from multiple physical ailments, including lower back pain, knee pain, carpel tunnel syndrome ("CTS"), osteoarthritis, and fibromyalgia.  In 2005, she had right knee surgery.  In 2008, she had carpal tunnel surgery on her left hand, and in the next year she had the same surgery on her right hand.  At the end of 2008, she was diagnosed with psoriatic arthritis,[1] a condition causing joint stiffness and pain in her hands and feet.  In 2009, she had left knee surgery.

Beauregard testified at the November 2010 administrative hearing that, on a typical day that she did not work, she got up at around 1 or 2 a.m., showered, met her brother for breakfast, and returned home to do nothing for the rest of the day.  (AR 63–64.)  She further testified that, for approximately three hours one day every other week, she worked cleaning houses.[2]  (AR 62–63.)  Over two years later, at the April 2013 administrative hearing, Beauregard testified that, because of her chronic pain and limited ability to walk, stand, sit, kneel, bend over, and use her hands, she stopped working in January 2013.  (AR 80–82.)  More specifically, she stated that, as a result of her pain, she

---

[1]  The symptoms of psoriatic arthritis are "polyarthritis (arthritis involving several joints) and psoriasis [(a condition characterized by the eruption of circumscribed, discrete, and confluent, reddish, silvery-scaled maculopapules)] of the skin or nails."  J.E. Schmidt, *4-P Attorneys' Dictionary of Medicine* P-96849 (2009), *available at* Lexis DICMED.  "The psoriasis or the arthritis may come first.  The arthritis especially affects the joints between the bones of the fingers and toes, but large joints (e.g., the sacroiliac) are also affected.  The arthritis may subside, but it may also progress to severe crippling."  *Id.*

[2]  Beauregard's 2010 testimony that she was working cleaning houses for only *three hours every other week* (AR 62–63) appears to conflict with her statement in a March 2009 Work Activity Report that she reduced her work hours to *six per week* in October 2008 (AR 290), and her 2013 testimony that in 2012 she cleaned houses for approximately *six-to-eight hours per week* (AR 80–81).  Reading the record as a whole, it appears that Beauregard worked approximately six hours per week from October 2008 until she stopped working in January 2013, with some variation among weeks in that period.

was able to walk for only "minutes" and sit for only approximately one hour in an eight-hour day.  (AR 82.)

In March 2009, Beauregard filed an application for social security disability insurance benefits.  Therein, she alleged that she was unable to work as a result of her arthritis, degenerative disc disease, fibromyalgia, back pain, blood clot, knee replacement, panic attacks, sleep apnea, CTS, and tendonitis.  (AR 283.)  In an updated disability form, she stated that she was diagnosed with psoriatic arthritis and was in constant pain, having to sit and lay down frequently throughout the day.  (AR 318, 321.)  Beauregard's application was denied initially and upon reconsideration, and she timely requested an administrative hearing.

The first administrative hearing was held on November 5, 2010 by Administrative Law Judge ("ALJ") Thomas Merrill.  (AR 57–75.)  Beauregard appeared and testified, and was represented by counsel.  On November 24, 2010, the ALJ issued a decision finding that Beauregard was not disabled through January 7, 2008, the date last insured.  (AR 36–45.)  The Decision Review Board failed to review the decision within the specified period, and Beauregard requested review by this Court.  (AR 1–3.)  In August 2011, pursuant to the parties' agreement, the Court remanded the matter to the Commissioner for further administrative proceedings to consider "the previously unadjudicated period from January 7, 2008, through Beauregard's date last insured[, September 30, 2012]."  (AR 30–31.)  ALJ Merrill held a second administrative hearing on April 15, 2013.  (AR 76–92.)  Beauregard again appeared and testified, and was represented by counsel.  On May 20, 2013, the ALJ issued a new decision finding that

Beauregard was not disabled from January 7, 2008 through the date of the decision.  (AR 7–18.)  Having exhausted her administrative remedies, Beauregard filed the Complaint in this action on August 5, 2013.  (Doc. 5.)

## **ALJ Decision**

The Commissioner uses a five-step sequential process to evaluate disability claims.  *See Butts v. Barnhart*, 388 F.3d 377, 380–81 (2d Cir. 2004).  The first step requires the ALJ to determine whether the claimant is presently engaging in "substantial gainful activity."  20 C.F.R. §§ 404.1520(b), 416.920(b).  If the claimant is not so engaged, step two requires the ALJ to determine whether the claimant has a "severe impairment."  20 C.F.R. §§ 404.1520(c), 416.920(c).  If the ALJ finds that the claimant has a severe impairment, the third step requires the ALJ to make a determination as to whether that impairment "meets or equals" an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings").  20 C.F.R. §§ 404.1520(d), 416.920(d).  The claimant is presumptively disabled if his or her impairment meets or equals a listed impairment.  *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984).

If the claimant is not presumptively disabled, the ALJ is required to determine the claimant's residual functional capacity ("RFC"), which means the most the claimant can still do despite his or her mental and physical limitations based on all the relevant medical and other evidence in the record.  20 C.F.R. §§ 404.1520(e), 404.1545(a)(1), 416.920(e), 416.945(a)(1).  The fourth step requires the ALJ to consider whether the claimant's RFC precludes the performance of his or her past relevant work.  20 C.F.R. §§ 404.1520(f), 416.920(f).  Finally, at the fifth step, the ALJ determines whether the

4

claimant can do "any other work."  20 C.F.R. §§ 404.1520(g), 416.920(g).  The claimant

bears the burden of proving his or her case at steps one through four, *Butts*, 388 F.3d at

383; and at step five, there is a "limited burden shift to the Commissioner" to "show that

there is work in the national economy that the claimant can do," *Poupore v. Astrue*, 566

F.3d 303, 306 (2d Cir. 2009) (clarifying that the burden shift to the Commissioner at step

five is limited, and the Commissioner "need not provide additional evidence of the

claimant's [RFC]").

Employing this sequential analysis, ALJ Merrill first determined that Beauregard

had not engaged in substantial gainful activity since her alleged onset date of

January 7, 2008.  (AR 10.)  At step two, the ALJ found that Beauregard had the following

severe impairments: degenerative disc disease, degenerative joint disease (left knee),

osteoarthritis, psoriatic arthritis, fibromyalgia, and obesity.  (*Id.*)  Conversely, the ALJ

found that Beauregard's CTS, chronic obstructive pulmonary disease, gastroesophageal

reflux disease, right rotator cuff impingement, anxiety, and depression were nonsevere,

given that they did not cause more than minimal limitation in Beauregard's ability to

perform basic physical or mental work activities.  (AR 10–11.)  At step three, the ALJ

found that none of Beauregard's impairments, alone or in combination, met or medically

equaled a listed impairment.  (AR 12–13.)

Next, the ALJ determined that Beauregard had the RFC to perform "light work,"

as defined in 20 C.F.R. § 404.1567(b), including occasional stair climbing, balancing and

stooping, but was "unable to kneel, crouch, crawl, or climb ladders, ropes[,] and

scaffolds."  (AR 13.)  Given this RFC, and considering the VE's testimony, the ALJ

found that Beauregard was capable of performing her past relevant work as a housekeeper as the job is generally performed.  (AR 16.)  Alternatively, again considering the VE's testimony, the ALJ found that Beauregard could perform other jobs existing in significant numbers in the national economy, including the jobs of mail clerk, marker, and dispatcher.  (AR 16–17.)  The ALJ concluded that Beauregard had not been under a disability from the amended alleged disability onset date of January 7, 2008 through the date of the decision.  (AR 18.)

## Standard of Review

The Social Security Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  A person will be found disabled only if it is determined that his "impairments are of such severity that he is not only unable to do his previous work[,] but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

In considering a Commissioner's disability decision, the court "review[s] the administrative record *de novo* to determine whether there is substantial evidence supporting the . . . decision and whether the Commissioner applied the correct legal standard."  *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002) (citing *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000)); *see* 42 U.S.C. § 405(g).  The court's factual review of

the Commissioner's decision is thus limited to determining whether "substantial evidence" exists in the record to support such decision.  42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991); *see Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the factfinder.").  "Substantial evidence" is more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Poupore*, 566 F.3d at 305.  In its deliberations, the court should bear in mind that the Social Security Act is "a remedial statute to be broadly construed and liberally applied." *Dousewicz v. Harris*, 646 F.2d 771, 773 (2d Cir. 1981).

<u>**Analysis**</u>

Beauregard argues that the ALJ misrepresented the medical evidence, improperly analyzed the medical opinions, and wrongly determined that she was not credible.  She further argues that the matter should be reversed for a calculation of benefits rather than remanded for further proceedings and a new decision.  The Commissioner reframes the issues, principally asserting that substantial evidence supports the ALJ's determination of Beauregard's RFC.  I recommend finding in favor of Beauregard, but remanding for a new analysis of the medical opinions and reconsideration of other issues, as discussed below, rather than reversing for a calculation of benefits.

**I.      The ALJ erred in his analysis of the medical opinions.**

Beauregard asserts that the ALJ should have afforded controlling weight to the opinions of her primary care physician, Dr. Adam Schwarz, who treated her from 2007

through the date of the ALJ's 2013 decision.  In April 2013, Dr. Schwarz completed a

"Fibromyalgia Residual Functional Capacity Questionnaire," in which he opined that,

since approximately 2007, Beauregard would be absent from work for more than four

days each month as a result of her impairments or treatment.  (AR 808.)  Dr. Schwarz

further opined that Beauregard could do no more than 10 hours of light work each week.

(AR 810.)  He explained that Beauregard's symptoms—including multiple tender points,

chronic fatigue, morning stiffness, muscle weakness, severe headaches, numbness and

tingling, anxiety, depression, and CTS—would "[c]onstantly" interfere with her ability to

work; that she would need to shift from sitting, standing, and walking at will, and would

need to take unscheduled 5–10-minute breaks every 30 minutes; and that she could only

"[o]ccasionally" engage in activities requiring reaching, fingering, and/or handling.  (AR

806–08.)

The opinions of a treating physician such as Dr. Schwarz are entitled to

"controlling weight" if they are "well-supported by medically acceptable clinical and

laboratory diagnostic techniques and . . . not inconsistent with the other substantial

evidence in [the] record."  20 C.F.R. § 404.1527(c)(2); *see Schisler v. Sullivan*, 3 F.3d

563, 567–69 (2d Cir. 1993).  Even when a treating physician's opinions are not given

controlling weight, they are still entitled to some weight because a treating physician is

"likely to be the medical professional[] most able to provide a detailed, longitudinal

picture of [the claimant's] medical impairment(s) and may bring a unique perspective to

the medical evidence . . . ."  20 C.F.R. § 404.1527(c)(2).  When the ALJ decides to afford

less than controlling weight to a treating physician's opinions, the ALJ must consider the

8

regulatory factors—including but not limited to, the length of the treatment relationship, the frequency of examination, and whether the opinions are consistent with the record as a whole—in determining how much weight is appropriate. *Richardson v. Barnhart*, 443 F. Supp. 2d 411, 417 (W.D.N.Y. 2006) (citing *Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000); 20 C.F.R. § 404.1527(d)(2)–(6)); *see* 20 C.F.R. § 404.1527(d).  After considering these factors, the ALJ must "give good reasons" for the weight afforded to the treating physician's opinions. *Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008) (quotation marks and citation omitted).

Here, without considering the long-standing and significant treatment relationship Dr. Schwarz had with Beauregard, the ALJ gave "limited weight" to Dr. Schwarz's April 2013 opinions for three principal reasons.  (AR 16.)  First, the ALJ found the opinions to be "conclusory," "given on a check-off form, with little objective evidence used to support [them]."  (*Id.*)  The record does not support the ALJ's characterization.  Although Dr. Schwarz's April 2013 opinions were made, in part, by checking off boxes on a form, Dr. Schwarz provided written explanations to support his opinions.  (*See* AR 806–10.) Specifically, in response to a request to identify the "clinical findings" showing Beauregard's medical impairments, Dr. Schwarz stated that Beauregard had "18/20" "pressure/pain spots activated."  (AR 806.)  And in response to a request to describe the nature, frequency, and severity of Beauregard's pain, Dr. Schwarz stated that Beauregard had pain "daily" and it "rang[ed] from 3/10 to 10/10."  (AR 807.)  Dr. Schwarz further explained, in his own words and not merely by checking a box, that Beauregard's ability to work was limited because of: the unpredictability of exacerbations of her symptoms;

her use of medications, which Dr. Schwarz stated resulted in sedation and fatigue; and "most obviously," the severity and frequency of her pain.  (AR 807, 809.)

Second, the ALJ gave limited weight to Dr. Schwarz's opinions on the grounds that they were "inconsistent with the medical evidence of record, including his own medical notes."  (AR 16.)  In fact, however, Dr. Schwarz's progress notes are consistent with his opinions, reflecting that Beauregard was limited by her osteoarthritis, CTS, joint pain, lower back pain, and other symptoms.  For example, in a November 2007 progress note, Dr. Schwarz assessed Beauregard as having CTS, depression, and anxiety, and observed that she had positive shoulder impingement.  (AR 433–34.)  In a January 2008 note, Dr. Schwarz stated that Beauregard's CTS required surgery, as it was a "persistent problem despite [physical therapy, occupational therapy,] and bracing" (AR 430); and observed that Beauregard had positive Tinel's and Phalen's signs[3] and positive shoulder impingement (AR 431).  In a February 2009 note, Dr. Schwarz stated that Beauregard exhibited "[sacroiliac] joint [(lower back)] tenderness, severe [on the] right."  (AR 423.)  In a March 2009 note, Dr. Schwarz diagnosed generalized osteoarthritis and fibromyalgia, among other conditions.  (AR 419.)  In October 2010, Dr. Schwarz indicated in a handwritten note to Beauregard's attorney that he agreed with the opinions of physical therapist ("PT") Michael Woll that Beauregard could not perform full-time work at even a sedentary level because of her limited ability to sit, stand, and walk for

---

[3]  "Tinel's sign" is "[a] tingling sensation at the end of a limb produced by tapping the nerve at a site of compression or injury."  J.E. Schmidt, *5-T Attorneys' Dictionary of Medicine* T-116232 (2009), *available at* Lexis DICMED.  Tinel's sign and Phalen's sign are indicators of carpal tunnel syndrome. The syndrome is confirmed "if the patient experiences a tingling sensation that radiates into the thumb, index finger[,] and the middle and lateral half of the ring finger."  *Id.* at *4-P Attorneys' Dictionary of Medicine* P-90455.

extended periods.  (AR 681–83.)  In November 2010, Dr. Schwarz stated in a progress note that Beauregard looked to be "owning her pain better – and owning the fact she can[]not work."  (AR 685.)  He stated that Beauregard was "still clearly disabled," observing that "she has trouble getting up from a chair and . . . has pain sitting for more than 15 min[utes,] . . . without any malingering manner [or] characteristics."  (*Id.*)  Over a year later, Dr. Schwarz held the same opinions, stating in a January 2012 progress note that it was "amazing" Beauregard had been denied disability benefits, "given her limited [ability to] function."  (AR 789.)

Dr. Schwarz's opinions are also consistent with those of Beauregard's other treating providers, including rheumatologist Dr. Daniel Albert, physician's assistant ("PA") Thomas Brudz, PT Woll, and chiropractor James McGlinn, as well as with the opinions of consultative examiner Dr. John Leppmann.  Generally, Beauregard's treating providers confirmed diagnoses of fibromyalgia, osteoarthritis, CTS, and psoriatic arthritis based on examination and test results, and noted her subjective complaints of back pain and shoulder tenderness without questioning her credibility.  (*See, e.g.*, AR 451, 565, 567, 591, 691.)  For example, in June 2008, Dr. Albert stated: "[Beauregard's] musculoskeletal exam does reflect osteoarthritis . . . .  [H]er EMG is unequivocal for left greater than right carpal tunnel.  She has tennis elbow and fibromyalgia tender points." (AR 451.)  In September 2009, Dr. Albert stated: "She is . . . tender in both shoulders. She also has tender points consistent with fibromyalgia."  (AR 567.)  In December 2009, Dr. Albert stated: "She does have rotator cuff tendonitis on exam on the right."  (AR 603.)  And in February 2010, Dr. Albert stated: "Her extremities show . . . psoriasis,

which is much worse than it was last time and active [joint inflammation] at her [hands, fingers,] and wrists bilaterally." (AR 608.) In July 2010, PA Brudz stated that Beauregard's "physical exam findings reveal a mild scoliosis convex to the left[,] tenderness from L4-S1 and over both S1 joints," and that she "has limited range of motion of her lumbar spine with low back pain and had a catching pain with returning to neutral position from a flexed position." (AR 691.) Brudz continued: "Her imaging shows scoliosis of her lumbar spine with a degenerative lateral listhesis of L4 on L5 degenerative disk changes and facet arthropathy. . . . MRI [of lumbar spine] revealed some degenerative disk changes, and L4-5 facet hypertrophy leading to some mild bilateral foraminal narrowing." (*Id.*)

Also consistent with Dr. Schwarz's opinions, in October 2010, PT Woll opined in an ErgoScience FCE Physical Work Performance Evaluation and summarizing Interrogatories (AR 666–76) that Beauregard could do only light work and, due to her limited ability to stand and walk, for only 1/3 of the day. (AR 666.) Woll explained that, due to her need to take breaks, Beauregard "would not be able to tolerate an 8[-]hour day at the light level," and she would need to be able to "change positions and functions in her part[-]time work fairly often. (*Id.*) Woll further opined that Beauregard "is not likely to be able to downgrade to sedentary level work due to a limited sitting tolerance and a low manual dexterity score which is required for most sedentary positions." (*Id.*) Woll noted that there was "no evidence of low effort and inconsistent behavior" on behalf of Beauregard, and that she "appeared to give a full maximum effort throughout the ErgoScience FCE." (AR 670.) In the summarizing Interrogatories, Woll explained:

> [Beauregard] is limited in the amount of continuous activity she can perform at the light level as indicated by her inability to complete the full 3[-]hour FCE without rest breaks as well as by her significantly decreased performance from the beginning of the evaluation to the end. You will also notice that all of her dynamic strength tests are rated as only occasional activities due to her level of pain with activity.

(AR 675.) Similarly, in April 2009, chiropractor James McGlinn, who saw Beauregard for chiropractic care from approximately September 2007 through February 2009 (AR 409–14), opined as follows: "Due to the combination of Ms. Beauregard's fibromyalgia and multiple musculoskeletal problems, it is difficult for her to perform sustained activities such as lifting, bending at the waist, using her arms at shoulder height or above, or sitting." (AR 408.) McGlinn noted, however, that it was "difficult for [him] to say" how limited Beauregard was in performing these activities, deferring to an "impairment rating specialist" on that issue. (*Id.*)

A few months later, in July 2009, Dr. Leppman was consulted by Disability Determination Services to examine and evaluate Beauregard's physical functionality. Dr. Leppman opined as follows:

> In summary, Ms. Beauregard has a number of objectively recognizable areas of arthritis and degenerative disease, particularly noticeable on x-rays, combined with chronic musculoskeletal pain which may appropriately be fit into the fibromyalgia category. The overall result of this combination of problems has been a *marked decrease in her ability to do the sorts of work she had generally been carrying out, for example house[]keeping*.

(AR 528 (emphasis added).) The ALJ stated that he afforded "significant weight" to Dr. Leppman's opinions, and that these opinions "are generally consistent with the medical evidence of record." (AR 15.) But in fact, the ALJ did not afford significant weight to these opinions, given that Dr. Leppman explicitly opined that Beauregard could *not*

perform her prior work as a housekeeper (AR 528) and the ALJ conflictingly determined that Beauregard "was capable of performing [her] past relevant work as a housekeeper" (AR 16).  The ALJ erred in this analysis, neglecting to explain his decision to reject Dr. Leppman's opinion that Beauregard could not work as a housekeeper while apparently adopting Dr. Leppman's other opinions.  Although the Commissioner points out that Dr. Leppman's opinion that Beauregard could not work as a housekeeper was on an issue reserved to the Commissioner and thus outside Dr. Leppman's expertise, the ALJ did not note this deficiency, instead merely stating that he gave significant weight to Dr. Leppman's opinions.  The Commissioner may not substitute her own rationale when an ALJ fails to provide one.  *See Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999) ("A reviewing court may not accept appellate counsel's post hoc rationalizations for agency action.") (internal quotation marks omitted).

Therefore, the ALJ's first two reasons for affording limited weight to Dr. Schwarz's opinions—that they are (1) conclusory and unsupported, and (2) inconsistent with the medical evidence of record—are not supported by substantial evidence.  To the contrary, Dr. Schwarz's opinions are supported by his own treatment notes and consistent with the medical record as a whole, including other medical opinions.  The ALJ's third reason for affording limited weight to Dr. Schwarz's opinions also lacks merit.  Citing to Beauregard's April 2009 Function Report (AR 298–305), the ALJ's decision states that Dr. Schwarz's opinions are "not reflected in [Beauregard's] reported activities of daily living, which include some housework, gardening, driving[,] and shopping" (AR 16).  First, the cited Function Report does not indicate that Beauregard could do gardening;

14

rather, it states the opposite: "Gardening is out now – can't stoop over because of back [and] can't kneel because of knee replacement."  (AR 301.)  Second, the housework that Beauregard stated she could do in the Function Report was minimal: doing laundry for three hours once a week, putting dishes in the dishwasher, and cleaning toilets.  (AR 300.)  In the more recent October 2009 Function Report, Beauregard stated that, in terms of housework, she did just the laundry and for only four hours once a week, explaining that this involved her husband bringing her the dry clothes and her folding them while seated.  (AR 327.)  Beauregard stated that she was unable to do most housework because it was "to[o] hard on my back and knees, and makes my arm [and] shoulder ache."  (AR 328.)  Third, in terms of shopping, although the April 2009 Function Report indicates that Beauregard shopped in stores for food for dinner and dog food (AR 301), the more recent October 2009 Function Report states that she no longer shopped in stores and instead shopped by phone or mail.  (AR 328.)

Reading Beauregard's April 2009 Function Report as a whole, it does not indicate that she was able to engage in significant daily activity.  Beauregard states that her typical day involved getting up very early, roaming the house, showering, meeting her brother for coffee, doing some housework, taking a four-hour nap, cooking dinner, and going to bed at 7 p.m.  (AR 298.)  She stated that on some days she worked cleaning houses.  (*Id.*)  Although such activity could be considered robust, a review of the record indicates that Beauregard's work cleaning houses was not substantial during the alleged disability period.  At the November 2010 administrative hearing, Beauregard testified that she worked cleaning houses for only approximately three hours every two weeks.  (AR 62–

15

63.)  At the April 2013 hearing, she testified that she cleaned houses for only approximately six-to-eight hours each week.  (AR 81.)  An ability to work for three-to-eight hours each week in a job where the worker can set her own schedule, says little about a person's ability to work a regular job on a full-time basis.  Moreover, in her October 2009 Function Report, Beauregard stated that it took her five hours to clean a house that should take her two hours, and when she was done, she had to lay on the couch until bedtime, using a heating pad on her back, an ice pack on her knees, and Aspercreme on her shoulders and neck..  (AR 325.)

The ALJ noted in his decision that Beauregard reported enjoying snowshoeing, gardening, swimming, walking, traveling, going for rides, refinishing furniture, and writing poems.  (AR 15 (citing AR 302).)  But a review of the cited Function Report as well as the record as a whole reveals that Beauregard was no longer doing most of these activities during the relevant period.  Her October 2009 Function Report makes this clear, using the past tense to discuss these activities.  (AR 329.)  Specifically, after listing as her "hobbies and interests" refinishing furniture, snowshoeing, gardening, swimming, walking, and writing, Beauregard stated: "I *did* [these things] when they need*ed* to be done.  I thought I *did* them well."  (*Id.* (emphases added).)  Another activity relied on by the ALJ is Beauregard's ability to use a chainsaw, as documented in May 2008 emergency room notes indicating that Beauregard was injured while using the tool.  (AR 14 (citing AR 742–60).)  There is no indication, however, that Beauregard engaged in this activity on a frequent basis or for extended periods.  The ALJ did not ask Beauregard about this activity or the May 2008 injury at either of the two administrative hearings.

16

In sum, although it does appear that Beauregard was able to engage in more activities than the typical disability claimant–e.g., for a portion of the alleged disability period, she worked cleaning houses for several hours each week, did limited household chores, went food shopping, and socialized with family members—the record as a whole does not support the ALJ's characterization of Beauregard as being able to perform robust daily activities on a regular basis.  There are records indicating that Beauregard was able to do certain activities during the alleged disability period, but there are also records documenting her limited ability to do these same and other activities.  (*See, e.g.*, AR 298–305, 313, 321, 323, 325–32, 354–55.)  For example, in September 2010, social worker Elizabeth Ossen stated in a care management note that Beauregard "feels she has done her best to tolerate her pain, [but] any type of work results in increase[d] pain[,] and while she reports doing 'everything I need to' she also reports not being able to do many activities."  (AR 701.)  ALJs are entitled to resolve conflicts in the record, but they must consider the entire record rather than picking and choosing only that evidence which supports a particular conclusion.  *See Smith v. Bowen*, 687 F. Supp. 902, 904 (S.D.N.Y. 1988) (citing *Fiorello v. Heckler*, 725 F. 2d 174, 175–76 (2d Cir. 1983)).  Here, the ALJ's decision does not demonstrate that he considered the entire record.  Also noteworthy, there is "a significant difference," for purposes of determining disability, "between [engaging in] sporadic daily activities and working a [40]-hour week."  *Waters v. Astrue*, No. 5:10-CV-110, 2011 WL 1884002, at *7 (D. Vt. May 17, 2011) (citing *Polidoro v. Apfel*, No. 98 CIV.2071(RPP), 1999 WL 203350, at *8 (S.D.N.Y. Apr. 12, 1999) ("A claimant's participation in the activities of daily living will not rebut his or her

subjective statements of pain or impairment unless there is proof that the claimant engaged in those activities for sustained periods of time comparable to those required to hold a sedentary job.")).  The Second Circuit has long held that a claimant need not be an invalid, incapable of performing any daily activities, in order to receive disability benefits.  *See Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998); *Williams v. Bowen*, 859 F.2d 255, 260 (2d Cir. 1988).

For these reasons, I find that the ALJ erred in affording limited weight to the opinions of treating physician Dr. Schwarz.  Instead of relying on the opinions of Dr. Schwarz and consulting examiner Dr. Leppman, the ALJ gave "significant weight" to the opinions of non-examining agency consultant Dr. Green.  (AR 15.)  Dr. Green completed a Physical RFC Assessment of Beauregard in August 2009, concluding that Beauregard could perform light work but with some postural limitations.  (AR 529–36.)  Beauregard argues that the ALJ should not have given so much weight to Dr. Green's opinions because they were not based on a complete case record.  In fact, Dr. Green did not consider any evidence dated after Dr. Leppman's report of July 24, 2009.  Therefore, he did not consider PT Woll's and Dr. Schwarz's October 2010 opinions that Beauregard could do light work for only 1/3 of the day.  (AR 666, 681.)  Nor did Dr. Green consider Dr. Albert's August 2009 assessment of psoriatic arthritis (AR 565–67) and February 2010 observation that Beauregard's psoriasis was "much worse than it was last time" (AR 608).  Dr. Green also did not consider PA Brudz's July 2010 note that examination findings and imaging results revealed mild scoliosis, tenderness and limited range of motion in the lumbar spine, degenerative disk changes, and facet arthropathy.  (AR 691.)

Generally, where there are conflicting opinions between treating and consulting sources, the "consulting physician's opinions or report should be given limited weight." *Cruz v. Sullivan*, 912 F.2d 8, 13 (2d Cir. 1990).  This is particularly true where, as here, the consulting source did not examine the claimant and made their opinions without considering all the relevant medical information.  *See Vargas v. Sullivan*, 898 F.2d 293, 295 (2d Cir. 1990) ("The general rule is that . . . reports of medical advisors who have not personally examined the claimant deserve little weight in the overall evaluation of disability.") (internal quotation marks omitted); *Tarsia v. Astrue*, 418 F. App'x 16, 18 (2d Cir. 2011) (medical consultant's assessment deemed incomplete where it was unclear whether he reviewed all of the evidence, including in particular "the evaluation, radiographic, and diagnostic notes of . . . an orthopedist who diagnosed [claimant] with severe degenerative arthritis of the left knee and found her to be a candidate for total knee arthoplasty") (internal quotation marks omitted).  The ALJ should have given less weight to Dr. Green's opinions because they were made in August 2009, before significant medical evidence and opinions were added to the record, and they were inconsistent with other significant evidence, including the opinions of Dr. Schwarz, Dr. Leppman and PT Woll.

## II.   On remand, the ALJ should make new findings at steps two and four.

Beauregard correctly asserts that the ALJ erred in stating at step two that "[t]he records indicate no objective evidence of [Beauregard's] inability to use her hands or other limitations of the hands."  (AR 10–11.)  In fact, there is objective evidence demonstrating that Beauregard was limited in her ability to use her hands as a result of

her bilateral CTS and psoriatic arthritis.  (*See, e.g.*, AR 427, 430, 446, 449, 676.)  Thus, the ALJ should readdress this issue on remand.

Additionally, after conducting a new analysis of the medical opinions, the ALJ should reconsider his step-four finding that Beauregard could perform her past relevant work as a housekeeper, particularly considering her deficits in fine motor coordination and need to change positions frequently.

## III.   Reversal for calculation of benefits is not warranted.

Finally, Beauregard asks that the matter be reversed and remanded for a calculation of benefits rather than remanded for a new hearing and decision.  In cases where, as here, there are gaps in the administrative record or the ALJ has applied an improper legal standard, the "wiser course" is to remand for further proceedings and a new decision.  *Rosa v. Callahan*, 168 F.3d 72, 82–83 (2d Cir. 1999); *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996).  Beauregard argues that reversal for a calculation of benefits is warranted because almost five years have passed since she initially filed her application and the delayed adjudication was the result of ALJ error.  This argument fails, however, because the Second Circuit has held that the length of time that a claim has been pending is not a ground for remanding for payment of benefits.  *See Giddings v. Astrue*, 333 F. App'x 649, 655 (2d Cir. 2009) (although the court is "mindful of the often painfully slow process by which disability determinations are made, and that a remand for further evidentiary proceedings (and the possibility of further appeal) could result in substantial, additional delay[,]" the duration that a claim has been pending "is not a sufficient basis to reverse and award . . . benefits: a decision to reverse and direct an

award for benefits should be made only when . . . substantial evidence on the record as a whole indicates that the Claimant is disabled and entitled to benefits") (citations and internal quotation marks omitted).  It cannot be said that there is no doubt Beauregard will be determined disabled after a proper analysis of the medical opinions is performed, especially considering Beauregard's extensive daily activities.  Therefore, I recommend remanding for further proceedings and a new decision rather than reversing for a calculation of benefits.

## Conclusion

For these reasons, I recommend that Beauregard's motion (Doc. 17) be GRANTED in part, the Commissioner's motion (Doc. 22) be DENIED, and the matter be REMANDED for further proceedings and a new decision in accordance with this ruling.

Dated at Burlington, in the District of Vermont, this 12th day of June, 2014.

/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge

Any party may object to this Report and Recommendation within fourteen days after service thereof, by filing with the Clerk of the Court and serving on the Magistrate Judge and all parties, written objections which shall specifically identify those portions of the Report and Recommendation to which objection is made and the basis for such objections.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b)(2); L.R. 72(c). Failure to timely file such objections "operates as a waiver of any further judicial review of the magistrate's decision."  *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989).